## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JANICE SCHMIDT, | ) | CASE NO. 8:06CV12 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| METROPOLITAN UTILITIES | ) | |
| DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the parties' cross motions for summary judgment. (Filing Nos. 63 and 67.)   As set forth in this order, Defendant's motion for summary judgment is granted.

## I.   BACKGROUND

Plaintiff Janice Schmidt ("Schmidt") filed her complaint in this matter on January 12, 2006.  (Filing No. 1.)  The complaint alleges a claim of discrimination under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 1201 *et. seq.*, a claim of age discrimination under the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621-34, a claim of sex discrimination under Title VII, and  two state law claims of discrimination under the Nebraska Fair Employment Practices Act and Nebraska Act Prohibiting Unjust Discrimination in Employment Because of Age ("Nebraska Acts"), Neb. Rev. Stat. § 48-1101 and § 48-1001 *et seq.*  (Filing No. 1 at CM/ECF p. 1.)

After engaging in discovery, Defendant Metropolitan Utilities District ("MUD") filed its motion for summary judgment on October 11, 2007.  (Filing No. 63.)  Along with its motion, MUD filed a brief in support of its motion for summary judgment and an index of evidence in support of its motion for summary judgment.  (Filing Nos. 64-66.)  Schmidt also filed a motion for summary judgment on October 11, 2007.  (Filing No. 67.)  Along with her

motion, Schmidt filed numerous exhibits, which the court liberally construes as an index of evidence.  (Filing No. 67.)  The parties each filed opposition briefs to the motions for summary judgment.  (Filing Nos. 69 and 72.)[1]

The Federal Rules of Civil Procedure and the court's local rules require that evidence in support of a motion for summary judgment be "authenticated by affidavit." NECivR 7.1(b)(2)(C); *see also Stuart v. General Motors Corp.*, 217 F.3d 621, 636 n.20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e). Documents which do not meet those requirements cannot be considered.").

Additionally, the party seeking the entry of summary judgment in its favor must set forth "a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law."  NECivR 56.1(a)(1).  If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts."  NECivR 56.1(b)(1).  Such response must "address each numbered paragraph in the movant's statement" of facts and must contain pinpoint citations supporting the opposition.  *Id.*  "Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response." *Id.*

The court has carefully reviewed the documents submitted by both parties.  While MUD submitted a statement of material facts in accordance with the court's rules, Schmidt has

---

[1]For her opposition brief, Schmidt re-filed her motion for summary judgment.

not.  Further, MUD submitted evidence which was properly authenticated by affidavit or through Schmidt's sworn deposition testimony.  Schmidt submitted a document titled "final chronology" and exhibits which are not properly authenticated even when construed liberally.  On the whole, Schmidt's evidence submissions to the court do not constitute admissible evidence and are not a "concise response to" MUD's statement of material facts.[2]  Although the court must construe a pro se litigant's pleadings liberally, documents which do not comply with the Federal Rules of Civil Procedure and this court's local rules may not be considered.  In light of this, the court adopts the following undisputed material facts, the majority of which were set forth by MUD.[3]

## II.   RELEVANT UNDISPUTED FACTS

Background.

1.     Schmidt is a female resident of the State of Nebraska, born in 1954. (Filing No. 1, ¶¶ 1, 6; Filing No. 65, Attachs. 7 and 12.)

2.     Terry Slauter ("Slauter") was, at most times relevant to this litigation, Defendant's Building Operator and Plaintiff's immediate supervisor. (Filing No. 65, Attach. 1 at CM/ECF p. 23.)

3.     Virginia Dugan a/k/a Virginia Holland ("Dugan") was, during most of the time relevant to this litigation, one of Plaintiff's coworkers. (Filing No. 66,  Attach. 3 at ¶ 5.) Dugan is a female born in 1955. (*Id.* ¶ 5.)

---

[2]Notably, the majority of Schmidt's submission relates to time-barred and unexhausted claims and, even if properly authenticated, would have no bearing on the court's decision.

[3]Because the court finds that many of Plaintiff's claims are time-barred or have not been exhausted, only the relevant facts relating to claims which are properly before the court are summarized here.

4.      Paul Reed was, at all times relevant to this litigation, Defendant's Manager of Support Services and Vice President of Support Services. (*Id.* ¶ 3.)

5.      John Hemschemeyer was, at all times relevant to this litigation, Defendant's Vice President for Human Resources. (*Id.* ¶ 2.)

6.      Defendant hired Plaintiff on May 6, 1996, as a Temporary Chronic Account Reader (meter reader). (Filing No. 65, Attach. 1 at CM/ECF p. 20.)

7.      On or about November 15, 1997, Plaintiff was promoted to a full-time Meter Reader. (Filing No. 65, Attach. 1 at CM/ECF p. 21.)

8.      Effective June 12, 1999, Plaintiff sought and was transferred to the position of Building and Grounds Maintenance Worker. (Filing No. 65, Attach. 1 at CM/ECF p. 21; Filing No. 65, Attach. 2.)  Slauter became Plaintiff's immediate supervisor upon Plaintiff's transfer to the Support Services Department of Defendant's Maintenance Division. (Filing No. 66, Attach. 3 at ¶ 8.)

9.      The essential functions of Plaintiff's job as a Building and Grounds Maintenance Worker include the following:

• vacuum, sweep, mop, wax, and polish floors and stairways;
• empty trash containers;
• dust and polish furniture and equipment, clean walls, floors, and fixtures;
• pick up litter and clean walks around buildings;
• move furniture and equipment;
• shovel snow;
• spread ice remover;
• change light bulbs;
• mow, fertilize, and water grass;
• operate power sweeper, scrubbers, mowers, tractors, buffers, etc.

(Filing No. 65, Attach. 4; Filing No. 66, Attach. 3 at ¶ 9.)

4

10.     Upon transferring to the Support Services Department, Plaintiff began working with Dugan, a female coworker. Plaintiff claimed that, during the course of her employment with Defendant, Dugan interfered with Plaintiff's ability to do her job, which Plaintiff reported to Slauter. (Filing No. 65, Attach. 1, at CM/ECF pp. 24-25.)

11.     Plaintiff does not allege that Slauter or any other supervisor or decision-maker engaged in the activities which interfered with Plaintiff's job performance.  (Filing No. 65, Attach. 1 at CM/ECF p. 24.)

Plaintiff's Performance.

12.     During the scope and course of her employment with Defendant, Plaintiff received performance evaluations. As Plaintiff's supervisor, Slauter completed performance evaluations of Plaintiff in October 1999, March 2000, and June 2001. (Filing No. 66, Attach. 3 at ¶ 10.)

13.     Each of Plaintiff's performance evaluations has several types of ratings: one type consists of six ratings levels (five are numerical and the "N" level is for new employees), with "1" being the highest possible rating; a second type consists of two ratings levels: "Meets Requirements" or "Does Not Meet Requirements"; and a third type consists of three ratings levels: "Meets standard"; "Does not meet standard"; and "Exceeds standard." Each performance evaluation also has five areas of evaluation: (1) performance factors; (2) progress and continuing development; (3) overall rating; and (4) recommendations, objectives and comments.  Furthermore, each performance evaluation contains eleven (11) performance factors. (Filing No. 65, Attachs. 6, 8, and 14.)

14.     Regarding the performance factors on Plaintiff's October 1999 evaluation, Plaintiff was rated as follows: a. quality of work (accuracy: 3; neatness, 2; thoroughness, 3); b. quantity of work (productive output, 3; working efficiently and systematically, 3; economy of time "(own & others)," 4); c. initiative (ability to work independently, 3; ability to find tasks to do independently, 3; judgment, 3); d. teamwork (cooperates in meetings, 3; cooperates with supervisors, 3; cooperates with fellow employees, 4; accepts suggestions/criticism, 4; willingness to accept assignments, 3); e. job knowledge (understanding job procedures, 3; using equipment efficiently and taking care of it, 4; maintenance of skills, 3); f. communications (internal, 4; external, 4); g. dependability (follows instructions, meets requirements; punctuality, meets requirements; attendance, does not meet requirements); h. safety (understanding/knowledge of safety rules and procedures, does not meet standard; compliance with safety rules and procedures, does not meet standard); i. personal appearance, acceptable; j. most important factors, safety, quality of work, quantity of work, team work; and k. potential for advancement (leadership ability, 3; ability to handle pressure situation, 3; ability to plan work, 3; ability to direct others' work, N/A; demonstrates creativity, 3). (Filing No. 65, Attach. 6.)

15.     Based upon Plaintiff's October 1999 performance evaluation, she received an overall rating of 4. A rating of 4 is explained on the front page of the performance evaluation as follows: "The employee has performed at a less than expected level and needs improvement.   This may be a new employee who has not progressed or an employee who has declined from a good level." (*Id.*)

16.     Regarding the performance factors on Plaintiff's March 2000 evaluation, Plaintiff was rated as follows: a. quality of work (accuracy: 3; neatness, 3; thoroughness,

6

3); b. quantity of work (productive output, 3; working efficiently and systematically, 3; economy of time "(own & others)," 4); c. initiative (ability to work independently, 3; ability to find tasks to do independently, 3; judgment, 3); d. teamwork (cooperates in meetings, 3; cooperates with supervisors, 4; cooperates with fellow employees, 5; accepts suggestions/criticism, 5; willingness to accept assignments, 4); e. job knowledge (understanding job procedures, 3; using equipment efficiently and taking care of it, 3; maintenance of skills, 3); f. communications (internal, 5; external, N/A); g. dependability (follows instructions, meets requirements; punctuality, meets requirements; attendance, does not meet requirements); h. safety (understanding/knowledge of safety rules and procedures, meets standard; compliance with safety rules and procedures, meets standard); i. personal appearance, acceptable; j. most important factors, safety, quality of work, quantity of work, team work; and k. potential for advancement (leadership ability, 3; ability to handle pressure situation, 3; ability to plan work, 3; ability to direct others' work, N/A; demonstrates creativity, 3). (Filing No. 65, Attach. 8.)

17.     Based upon Plaintiff's March 2000 performance evaluation, she received an overall rating of 4, again at a "less than expected" level. (*Id.*)

18.     Regarding the performance factors on Plaintiff's June 2001 evaluation, Plaintiff was rated as follows:  a. quality of work (accuracy: 3; neatness, 3; thoroughness, 3); b. quantity of work (productive output, 4; working efficiently and systematically, 3; economy of time "(own & others)," 4); c. initiative (ability to work independently, 3; ability to find tasks to do independently, 3; judgment, 3); d. teamwork (cooperates in meetings, 4; cooperates with supervisors, 4; cooperates with fellow employees, 4; accepts suggestions/criticism, 4; willingness to accept assignments, 4); e. job knowledge

7

(understanding job procedures, 3; using equipment efficiently and taking care of it, 3; maintenance of skills, 3); f. communications (internal, 5; external, N/A); g. dependability (follows instructions, meets requirements; punctuality, meets requirements; attendance, does not meet requirements); h. safety (understanding/knowledge of safety rules and procedures, meets standard; compliance with safety rules and procedures, meets standard); i. personal appearance, acceptable; j. most important factors, safety, quality of work, quantity of work, team work; and k. potential for advancement (leadership ability, 3; ability to handle pressure situation, 3; ability to plan work, 3; ability to direct others' work, N/A; demonstrates creativity, 3). (Filing No. 65, Attach. 14.)

19.     Based upon Plaintiff's June 2001 performance evaluation, she received an overall rating of 4, again at a "less than expected" level. (*Id.*)

20.     In addition to receiving these performance evaluations, Plaintiff admits that she "received several letters of reprimand." (Filing No. 65, Attach. 1, at CM/ECF p. 51.)

21.     In particular, Schmidt received numerous written and verbal reprimands between September 26, 2001 and December 17, 2002.  (Filing No. 65, Attachs. 15-23; Filing No. 66, Attachs. 1-2.)  In each instance, Schmidt received some disciplinary action and in all instances, Schmidt generally disagreed with the substance of the reprimands and/or with the disciplinary action taken.  (*Id.*)

Plaintiff's Charges of Discrimination.

22.     On January 31, 2000, Plaintiff filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission ("NEOC") (the "First Charge").  Plaintiff checked the boxes alleging a "continuing violation" of sex discrimination based upon offensive items and signs left in her work area (i.e., a condom, a "Pause for Pig" sign, and other

8

non-specific signs and objects) and retaliation based upon an unfavorable evaluation in October 1999 and cleaning areas that other employees are not required to clean. The First Charge alleged that the discrimination began on June 14, 1999, and continued through to the date the First Charge was filed. (Filing No. 65, Attach. 7.)

23.    On February 13, 2001, following its investigation, the NEOC issued a No-Cause Determination letter in response to Plaintiff's First Charge. (Filing No. 65, Attach. 11.)  Thereafter, on April 27, 2001, the Equal Employment Opportunity Commission ("EEOC") issued a "Notice of Rights" (a/k/a right-to-sue letter) in response to the First Charge. (Filing No. 65, Attach. 13.)

24.    Plaintiff did not file a lawsuit within 90 days relating to the issues/allegations raised in the First Charge.  (Filing No. 65, Attach. 1 at CM/ECF p. 36)

25.    On March 20, 2001, Plaintiff filed a second Charge of Discrimination with the NEOC (the "Second Charge").  Plaintiff checked the box alleging a "continuing violation" of retaliation based upon being assigned work duties not falling within her medical restrictions. The Second Charge alleged that the discrimination began on November 22, 2000, and continued through to the date the Second Charge was filed. (Filing No. 65, Attach. 12; Filing No. 65, Attach. 1 at CM/ECF pp. 45-46.)

26.    On September 23, 2002, following its investigation, the NEOC issued a second No-Cause Determination letter respecting Plaintiff's Second Charge. (Filing No. 65, Attach. 24; Filing No. 65, Attach. 1, CM/ECF p. 47-48.)

27.    Plaintiff did not file a lawsuit addressing the issues raised in the Second Charge within 90 days of receiving the NEOC's No Cause Determination letter. (Filing No. 65, Attach. 1 at CM/ECF p. 48.)  There is no evidence that Plaintiff ever contacted the

9

EEOC to obtain a "right-to-sue" letter.  However, Schmidt testified at her deposition that the EEOC agreed with the NEOC's findings regarding the Second Charge.  (*Id.*)

28.    On November 10, 2004, Plaintiff filed a third Charge of Discrimination with the NEOC (the "Third Charge").  In the Third Charge, Plaintiff did not allege a continuing violation, but alleged retaliation based upon harassment (alleged comments from Slauter) and disciplinary actions (for Plaintiff's attendance and being out of her work area) and disability discrimination based upon Defendant's purported refusal to accommodate her disability and Defendant's termination of Plaintiff's employment. (Filing No. 66, Attach. 16.) The Third Charge was amended on February 24, 2005, again without alleging any continuing violations, alleging age discrimination and sex discrimination based upon Defendant's retention of several male employees. (Filing No. 66, Attach. 18.)

29.    On September 16, 2005, following its investigation, the NEOC issued a third No-Cause Determination letter respecting Plaintiff's Third Charge as amended.  (Filing No. 66, Attach. 22.) Thereafter, on November 21, 2005, the EEOC issued a "Notice of Rights" (a/k/a right-to-sue letter) respecting the Third Charge. (Filing No. 66, Attach. 23.)

30.    On January 12, 2006, Plaintiff filed this Complaint against Defendant. (Filing No. 1.)

Plaintiff's Medical Restrictions.

31.    On March 20, 2000, Plaintiff reported an on-the-job injury to her "back, shoulders, arms, body, knees, [and] hands." (Filing No. 65, Attach. 9.)

32.    Subsequently, as a result of the March 2000 report of injury, Plaintiff took sick/short-term disability ("STD") leave and returned to work in November 2000. (Filing No. 65, Attach. 1 at CM/ECF p. 42.)

10

33.     On November 21, 2000, Defendant's physician, Donald M. Gammel, M.D. ("Dr. Gammel"), prepared an Activity Status Report indicating that Plaintiff was released from his care. In so doing, Dr. Gammel wrote that Plaintiff was under a medical restriction until her next doctor's visit, namely, "[n]o squatting and/or kneeling." (Filing No. 65, Attach. 10.)  Defendant followed these restrictions. (Filing No. 66, Attach. 3 at ¶ 12.)

34.     In January 2003, Defendant hired an outside firm, Excel Physical Therapy, to help evaluate exactly what job functions Plaintiff could perform. (*Id.* at ¶ 13.) However, Excel reported that Plaintiff "did not volunteer to perform any of the tasks and was unwilling to perform some specific tasks," which Excel had requested in order to evaluate Plaintiff. (*Id.*; *see also* Filing No. 66, Attach. 28.)

35.     On April 7, 2003, Mark G. Franco, M.D., noted in an orthopedic report to Plaintiff's counsel that "much of [Plaintiff's 5% medical] impairment may be related to the damage to the knee joint and pre-existing arthritis dating back more than 10 years." (Filing No. 66, Attach. 5.)

36.     On November 13, 2003, Plaintiff filed an ex parte Petition and Affidavit for a Harassment Protection Order against Slauter in the District Court of Douglas County, Nebraska, alleging that he tried to force her off the road.  (Filing No. 66, Attach. 6.) However, Slauter vehemently denied this allegation. (Filing No. 66, Attach. 3 at ¶ 15.)

37.     Plaintiff and Slauter subsequently executed a memorandum of understanding on February 26, 2004, which resolved their differences, established the parameters and scope of their supervisor-employee relationship, and resolved the Protection Order. (Filing No. 66, Attach. 7.)  Nothing in the Protection Order or in Plaintiff's allegations related to any issue of discrimination.  (*Id.*)

11

38.    From the date Plaintiff sought a Protection Order against Slauter in November 2003 through February 26, 2004, Plaintiff was assigned temporarily to Defendant's Florence water treatment plant while Plaintiff's attorneys and Slauter attempted to resolve the Protection Order. (Filing No. 66, Attach. 3 at ¶ 15; *see also* Filing No. 65, Attach. 1 at CM/ECF p. 59.)  Although an open position was not available for Plaintiff at Florence, Defendant provided temporary work there that was within her restrictions.  (Filing No. 66, Attach. 3 at ¶ 15.)

39.    On March 1, 2004, M. Olubunmi Dada, M.D., Ph.D ("Dr. Dada"), Plaintiff's physician, established the following permanent medical restrictions for Plaintiff: no frequent or excessive walking; no bending; no squatting; no climbing; and no lifting more than 30 pounds.  (Filing No. 66, Attach. 8.)

40.    On March 3, 2004, Plaintiff began a leave of absence from work as result of Dr. Dada's medical restrictions.  (Filing No. 66, Attach. 3 at ¶ 18.)

41.    On March 4, 2004, Marcel Miller, R.N. ("Miller"), Defendant's nurse, confirmed that Dr. Dada's restrictions were permanent in nature. (Filing No. 66, Attach. 9.)

42.    On March 12, 2004, based upon Dr. Dada's permanent medical restrictions, Defendant informed Plaintiff that it had decided to place her on sick/STD leave for twenty-six (26) weeks, effective March 10, 2004, through September 7, 2004. (Filing No. 66, Attach. 10; *see also* Filing No. 65, Attach. 1 at CM/ECF p. 61.)  Defendant paid Plaintiff 75% of her base hourly rate for eight (8) weeks and 50% of her base hourly salary for 18 weeks, pursuant to Defendant's STD policy.  (Filing No. 66, Attach. 3 at ¶ 20.)

43.     Plaintiff was not moved to Florence due to her restrictions but rather due to Plaintiff's attorneys and Slauter trying to sort out issues relating to the Protection Order with Slauter. (Filing No. 66, Attach. 3 ¶ 15.)

44.     On April 27, 2004, Plaintiff submitted an Application for Sick Pay Benefits. (Filing No. 66, Attach. 11.)

45.     On June 24, 2004, Defendant informed Plaintiff that if she could not return to work and perform all the essential functions of her job by September 7, 2004, she would, pursuant to Defendant's general policy that applied to all employees, be removed from Defendant's payroll.  (Filing No. 66, Attach. 12.) At that time, Defendant notified Plaintiff that she might be eligible for long-term disability ("LTD") benefits upon completion of her STD benefits.  (Filing No. 66, Attach. 3 at ¶ 21.)

46.     On September 1, 2004, Becky White, P.A., Dr. Dada's physician's assistant, informed Miller that Plaintiff's restriction remained the same as earlier and might have even worsened.  (Filing No. 66, Attach. 13; *see also* Filing No. 65, Attach. 1 at CM/ECF p. 63.)

47.     On September 8, 2004, Plaintiff was removed from Defendant's payroll as an active employee because she had exhausted her STD/sick pay benefits and all leave and because her medical restrictions (as established by her own physicians) prevented her from performing the essential functions of her job, with or without accommodation. (Filing No. 66, Attach. 3 at ¶ 23; Filing No. 66, Attach. 14.)

48.     Although Slauter was Plaintiff's supervisor, he did not make the decision to terminate Plaintiff. (Filing No. 66, Attach. 3 at ¶ 24.)

13

49.    On November 1, 2004, Plaintiff submitted an application for LTD benefits through Mutual of Omaha, Defendant's insurance carrier. (Filing No. 66, Attach. 15; Filing No. 66, Attach. 3 at ¶ 25.)

50.    On January 11, 2005, Defendant received notification from Mutual of Omaha that Plaintiff's application for LTD benefits had been approved and that she began receiving LTD benefits retroactively, effective September 8, 2004. (Filing No. 66, Attach. 16; Filing No. 66, Attach. 3 at ¶ 26.)

51.    On May 2, 2005, Plaintiff submitted an Application for Supplemental Security Income. (S.J. Attach. 1, at 18:14-29:2.)  On said application, Plaintiff indicated that she "is disabled."  (Filing No. 66, Attach. 19.)

52.    On May 2, 2005, Plaintiff submitted an Application for Disability Insurance Benefits. On said application, Plaintiff indicated that she "became unable to work because of my disabling condition" on March 3, 2000, and "is still disabled."  (Filing No. 66, Attach. 20.)

### III.    ANALYSIS

#### A.    Standard of Review

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir. 1994).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Bell v.*

14

*Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).   In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.' " *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.*  Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.    Exhaustion of Remedies and Timeliness of Plaintiff's Claims.

Where an individual has "initially instituted proceedings with a State or local agency," alleging that she has been subject to unlawful employment practices, she must also file a charge with the EEOC "within three hundred days after the alleged unlawful employment practice occurred."   42 U.S.C. § 2000e-5(e)(1).   This exhaustion of administrative remedies "is a condition precedent to the filing of an action under the ADEA in federal court." *Shelton v. Boeing Co.*, 399 F.3d 909, 912 (8th Cir. 2005) (citations omitted).  As set forth by the Eighth Circuit:

> The reason for requiring the pursuit of administrative remedies first is to provide the EEOC with an initial opportunity to investigate allegations of employment discrimination and to work with the parties toward voluntary compliance and conciliation. . . . The proper exhaustion of administrative

> remedies gives the plaintiff a green light to bring [his or] her employment-discrimination claim, along with allegations that are "like or reasonably related" to that claim, in federal court. . . . Although we have often stated that we will liberally construe an administrative charge for exhaustion of remedies purposes, we also recognize that there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo*, a claim which simply was not made.

*Id.* (internal citations and quotations omitted). In short, where a claim of unlawful employment practices was never presented to and decided by the EEOC, it is not properly before this court.

Additionally, once filed with the EEOC, if the charge is dismissed, the EEOC "shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge . . . by the person claiming to be aggrieved." 42 U.S.C. § 2000e-5(f)(1). Claims not filed within 90 days of receiving the notice of the dismissal of the charge are time-barred. *Williams v. Thomason Corp.*, 383 F.3d 789, 790-91 (8th Cir. 2004). The 90-day period is tolled "only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands." *Id.* at 791 (citations omitted).

As set forth above, Schmidt filed three separate charges with the NEOC. The First Charge was submitted on January 31, 2000 and alleged a continuing violation of sex discrimination and retaliation. (Filing No. 65, Attach. 7.) The NEOC made a finding of "no reasonable cause" for the First Charge on February 13, 2001. (Filing No. 65, Attach. 11.) On April 17, 2001, the EEOC adopted the NEOC findings on both charges and issued a "right-to-sue letter," informing Plaintiff that she had 90 days in which to file a "lawsuit against the respondent(s) under federal law based on this charge." (Filing No. 65, Attach. 13.)

16

Schmidt filed the Second Charge with the NEOC on March 20, 2001, alleging a continuing violation and retaliation.  (Filing No. 65, Attach. 12.)  In particular, Plaintiff claimed that she was retaliated against by MUD because she filed the First Charge.  (*Id.*) Plaintiff complained that MUD did not respect her physician-prescribed physical restrictions.  (*Id.*)  The NEOC made a finding of "no reasonable cause" for the Second Charge on September 23, 2002.  (Filing No. 65, Attach. 24.)  There is no indication in the record that Schmidt exhausted her remedies with the EEOC or received the required right-to-sue letter.

Schmidt filed the Third Charge with the NEOC on November 10, 2004, and amended that charge on August 3, 2005.  (Filing No. 66, Attachs. 16 and 18.)  As amended, the Third Charge alleged sex, age, and disability discrimination and retaliation between January 14, 2004 and September 8, 2004.  (Filing No. 66, Attach. 18.)  On September 16, 2005, the NEOC found "no reasonable cause" on all amended charges. (Filing No. 66, Attach. 22.)  The EEOC adopted the NEOC findings as to all amended charges and issued a right-to-sue letter and "notice of suit rights" on November 21, 2005. (Filing No. 66, Attach.23.)

Plaintiff filed the complaint in this matter on January 12, 2006.  (Filing No. 1.)  The court is aware of no other complaints relating to the First or Second Charges.  Plaintiff testified at her deposition that she did not file any complaints against MUD alleging unlawful employment practices other than the complaint in this matter.  (Filing No. 65, Attach. 1 at CM/ECF pp. 36, 47-48.)  Because the complaint was filed more than 90 days after the First Charge, Schmidt's claims relating to the First Charge are time-barred. Additionally, no right-to-sue letter has been submitted to the court regarding the Second

17

Charge.  Plaintiff has not exhausted her administrative remedies with respect to the Second Charge and those claims are also not properly before this court.  Moreover, Plaintiff testified that the EEOC agreed with the NEOC's findings on the Second Charge and that she did not file a lawsuit within 90 days as required.  (Filing No. 65, Attach. 1 at CM/ECF pp. 47-48.)

Therefore, the only claims the court will consider are those contained in Plaintiff's Third Charge.  Specifically, the court only considers Plaintiff's allegations of sex, age, and disability discrimination and retaliation which occurred between January 14, 2004, and September 8, 2004 as set forth in the Third Charge.  The court will "liberally read" Plaintiff's claims, but will not "invent[] . . . a claim which simply was not made.  *Shelton*, 399 F.3d at 912.

### C.   Claims Under the ADA.

Schmidt claims she was discriminated against in violation of the Americans with Disabilities Act (ADA) because she was terminated from MUD due to physical restrictions relating to her knees.  An employee seeking relief under the ADA must establish that :  1) she has a disability as defined in 42 U.S.C. § 12102(2); 2) she is qualified to perform the essential functions of the job, with or without reasonable accommodation; and 3) she has suffered adverse employment action because of her disability.  The employee retains the burden of persuading the trier of fact that she has been the victim of illegal discrimination due to her disability.   *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995).

18

"Diagnosis" does not imply "disabled" for the purposes of the ADA.  *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002).  Indeed, a person is disabled within the meaning of the ADA only if she demonstrates that she has a physical or mental impairment which substantially limits one or more of her major life activities, that she has a record of such an impairment, or that she is regarded as having such an impairment.  *Amir v. St. Louis University*,  184 F.3d 1017, 1027 (8th Cir. 1999).  "Major life activities under the ADA are basic activities that the average person can perform with little or no difficulty, including 'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' "  *Battle v. United Prcel Serv., Inc.*, 438 F.3d 856, 861 (8th Cir. 2006) (quoting 29 C.F.R. § 1630.2(I)).

However, "establishing 'disability' is a significant hurdle that can prevent a person who was denied a job because of an impairment from being covered by the ADA."  *Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 842-43 (8th Cir. 2005).  Determining whether an individual has a qualifying disability requires an individualized analysis of the claimed disability.  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999).  The Eighth Circuit has provided further guidance:

> To prove disability, plaintiffs must submit more than just evidence of a medical diagnosis of an impairment. . . .  Instead, the ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial.  In other words, the relevant inquiry when addressing the major life activity of performing manual tasks is whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with his specific job. The type of evidence most relevant to establishing a substantial limitation in the major life activity of performing manual tasks, includes, for example, an individual's ability to do household chores, bathe, brush one's teeth, prepare meals, do laundry, etc.

19

*Philip v. Ford Motor Co.*, 328 F.3d 1020, 1024-25 (8th Cir. 2003)(internal citations and quotations omitted). An impairment should be considered substantially limiting only if "an individual is '[s]ignificantly restricted as to the condition, manner or duration under which ... the average person in the general population can perform that same major life activity.'" *Moysis v. DTG Datanet*, 278 F.3d 819, 825 (8th Cir. 2002) (alteration in original) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). Furthermore, merely demonstrating that an impairment prevents one from performing job functions in the absence of accommodations does not suffice to demonstrate a disability. *Nuzum*, 432 F.3d at 842.

Schmidt has presented no evidence that she is substantially limited in a major life activity. There is no dispute of material fact that Schmidt has restrictions relating to her knee injuries and that she has a 5% permanent medical restriction. (Filing No. 66, Attach. 5.) However, there is no evidence that this restriction constitutes a "substantial limitation" upon a major life activity. Additionally, Plaintiff's complaint characterizes the medical restriction as "impacting" her ability to work, not substantially limiting a major life activity. (Filing No. 1 at ¶ 7.) Viewed in the light most favorable to Schmidt, the court finds no evidence that Schmidt's knee condition interferes with her daily life activities or the performance of manual daily tasks.[4]

Furthermore, Schmidt's entire ADA claim appears to rest on the allegation that she was terminated because she could not perform her job without MUD's accommodation of certain restrictions. (Filing No. 66, Attach. 18.) Taking this allegation as true, a showing

---

[4]Since her termination from MUD, Plaintiff has remained actively engaged in various life activities such as serving as President of an organization "Paws For Friendship, Inc." Her activities in the organization involve visiting "nursing homes, hospitals, care centers, cancer units, burn centers" with pets. (Filing No. 65, Attach. 1 at CM/ECF pp. 19-20.)

that one cannot perform their job without an accommodation is not enough to prove that an individual is disabled under the ADA. *Nuzum*, 432 F.3d at 842. Plaintiff has not met her burden to show that she is a disabled individual under the ADA and therefore she cannot make a *prima facie* case. Defendant MUD is entitled to summary judgment on Plaintiff's ADA claim.

### D.    Claims Under the ADEA.

The ADEA prohibits employers from discriminating against employees on the basis of age. 29 U.S.C. § 623(a)(1). In order to prevail on an age discrimination claim, a plaintiff must show "intentional discrimination against the plaintiff on account of the plaintiff's age." *Rothmeier*, 85 F.3d at 1331. A plaintiff can prove intentional discrimination by either presenting direct evidence of discrimination based on age or by presenting circumstantial evidence. *Id.* at 1332 (citations omitted). Where a plaintiff relies only on circumstantial, rather than direct, evidence, the court engages in a "three-stage burden-shifting analysis." *Id.* "Before a court can allow a discrimination case involving only circumstantial evidence to go to a jury, it must find sufficient evidence that would allow a reasonable factfinder to infer that age was a determinative factor in the adverse employment action." *Mayer v. Nextel West Corp.*, 318 F.3d 803, 810 (8th Cir. 2003).

Viewing the facts in the light most favorable to Schmidt, the court finds that Schmidt presented no direct evidence of discrimination based on age. Therefore, the court must conduct the three-stage burden-shifting analysis. *Rothmeier*, 85 F.3d at 1332. The burden-shifting analysis is set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

21

(1973) and its progeny.[5]  However, the "plaintiff retains at all times the ultimate burden of persuading the trier of fact that the adverse employment action was motivated by intentional discrimination."  *Rothmeier*, 85 F.3d at 1332 (citations omitted).

In the first stage of the *McDonnell Douglas* analysis, the plaintiff bears the burden of establishing a prima facie case of discrimination.  *Rothmeier*, 85 F.3d at 1332 (citations omitted).  To establish a prima facie claim of age discrimination, a plaintiff must show (1) she was at least forty years old; (2) she was terminated; (3) she was meeting the employer's reasonable expectations at the time of the termination; and (4) she was replaced by someone substantially younger.  *Mayer*, 318 F.3d at 807;  *see also Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1035 (8th Cir. 2005).  As to prong three of the *prima facie* case, the relevant inquiry is the decision maker's perception and judgment regarding the employee's performance.  *Brooks v. Ameren UE*, 345 F.3d 986, 988 (8th Cir. 2003);  *see also McPheeters v. Black & Veatch Corp.*, 427 F.3d 1095, 1104 (8th Cir. 2005).  The employee's own opinions about their performance are irrelevant.  *Brooks*, 345 F.3d at 988.

Schmidt has not submitted any evidence supporting a *prima facie* case of age discrimination.  Although the parties agree that Schmidt is over age 40 and that she was terminated, Schmidt has submitted no evidence regarding the other two prongs of the analysis.  Regarding whether Schmidt was meeting MUD's reasonable expectations at the time of her termination, the evidence is undisputed that Schmidt had very poor evaluations and was subject to extensive disciplinary actions.  (Filing No. 65, Attachs. 6, 8, and 14-23;

---

[5]Although *McDonnell Douglas* addressed discrimination claims in the context of Title VII, the same analytical framework "applies with equal force" to claims made under the ADEA.  *Rothmeier*, 85 F.3d at 1332. n. 5.

22

Filing No. 65, Attach 1 at CM/ECF p. 51; Filing No. 66, Attachs. 1-2.)  In short, Schmidt was not meeting MUD's reasonable expectations.  Schmidt's disagreement with her performance evaluations and discipline are irrelevant under the ADEA.  Further, Schmidt has not made an allegation, let alone produced any evidence, that she was replaced by someone substantially younger.  Viewed in the light most favorable to Schmidt, she cannot make a *prima facie* case for age discrimination and summary judgment in favor of Defendant is warranted as to Schmidt's claims under the ADEA.

### E.   Claims Under Title VII (Sex Discrimination).

Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Summary judgment may be entered in a Title VII action "if any essential element of the *prima facie* case is not supported by *specific facts* sufficient to raise a genuine issue for trial."  *Brower v. Runyon*, 178 F.3d 1002, 1005 (8th Cir. 1999) (emphasis added).

A *prima facie* case of sex discrimination requires the plaintiff to establish that she: (1) is a member of a protected class; (2) was meeting the legitimate expectations of her employer; (3) suffered an adverse employment action; and (4) that circumstances exist which give rise to an inference of discrimination.  *See Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir. 2004).  If a plaintiff establishes a *prima facie* case, then the burden shifts to the employer to produce evidence of a legitimate nondiscriminatory reason for its action.

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).  If the employer succeeds in this burden of production, then the burden shifts back to the plaintiff to prove that the employer's proffered reason was a pretext for intentional discrimination.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).  As in the ADEA context, the ultimate burden of persuasion remains with the plaintiff throughout the case.

A review of all of the evidence properly before the court shows that Schmidt's allegations of sex discrimination relate to "male employees" who have "retained their jobs after numerous DWI's, arrests, convictions, unexcused absences, etc." (Filing No. 66, Attach. 18.)  There is no dispute that Schmidt is a female and is therefore a member of a protected class.  There is likewise no dispute that she suffered an adverse employment action through her termination from MUD.  However, Schmidt must also satisfy the second and fourth prongs of her *prima facie* case.

The second prong of the *prima facie* case entails more than simply having met the requisite educational and experiential criteria for the position.  It means that the plaintiff must have been performing her job "at a level meeting [the plaintiff's] employer's legitimate expectations."  *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 472 n. 7 (8th Cir. 1995); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 546 (8th Cir. 1993).  At the "prima facie stage, [plaintiff] only need[s] to prove that '[she] was doing [her] job well enough to rule out the possibility that [she] was fired for inadequate job performance.' "  *Gill v. Reorganized Sch. Dist. R-6 Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994) (quoting *Crimm v. Missouri Pac. R. Co.*, 750 F.2d 703, 711 (8th Cir.1984); *see also, Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 943 (8th Cir.1994).

24

There is no genuine issue of material fact regarding Plaintiff's failure to perform her job at a level meeting MUD's expectations.  To the contrary, Plaintiff's evaluations were consistently poor and she was repeatedly insubordinate and subject to disciplinary actions. (Filing No. 65, Attachs. 6, 8, and 14-23; Filing No. 65, Attach 1 at CM/ECF p. 51; Filing No. 66, Attachs. 1-2.)  Schmidt has not submitted any evidence which rules out the possibility that she was fired for performance reasons.  Because Schmidt has not met her burden of establishing a *prima facie* case of sex discrimination, summary judgment in favor of MUD on Schmidt's Title VII claim is appropriate.

### F.    Claims Under the Nebraska Acts.

Plaintiff's claim under the Nebraska Fair Employment Practices Act is analyzed under the same framework as Title VII claims.  As set forth by the Nebraska Supreme Court, "[N]FEPA is patterned from that part of the Civil Rights Act of 1964 contained in 42 U.S.C. § 2000e et seq. (2000), and it is appropriate to look to federal court decisions construing similar and parent federal legislation."  *Helvering v. Union Pacific R.R. Co.*, 13 Neb. App. 818, 830 (2005); *see also Malone v. Eaton Corp.*, 187 F.3d 960, 962 n.3 (8th Cir. 1999).  Because Plaintiff cannot make a *prima facie* case of sex discrimination under Title VII, she also cannot sustain a claim under the Nebraska Fair Employment Practices Act.

Likewise, Nebraska state courts address claims under the Nebraska Act Prohibiting Unjust Discrimination in Employment Because of Age using the same analysis as the federal courts under the ADEA.  *Newhouse v. McCormick*, 110 F.3d 635, 643 (8th Cir. 1997); *see also Allen v. AT&T Technologies, Inc.*, 423 N.W.2d 424, 431 (1988) ("We

hereby adopt the same burden and method of proof for cases arising under the subject act. By so doing, we conform to the federal practice with respect to the federal Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* which the subject act closely parallels."). Therefore, for all of the reasons set forth in this order, the court grants MUD's motion for summary judgment as to Schmidt's claims under the Nebraska Acts.

## IV.   CONCLUSION

As set forth in this memorandum and order, there are no disputed issues of material fact regarding any of the claims made by Plaintiff in her complaint. Therefore, the court grants summary judgment in favor of Defendant Metropolitan Utilities District on all claims.

IT IS THEREFORE ORDERED that:

1. Defendant Metropolitan Utilities District's motion for summary judgment (filing no. 63) is granted as set forth in this memorandum and order. All claims against Defendant are dismissed with prejudice;

2. Plaintiff Janice Schmidt's motion for summary judgment (filing no. 67) is denied;

3. A separate judgment will be entered in accordance with this memorandum and order; and

4. The Clerk of the court is directed to send a copy of this memorandum and order and the judgment to Plaintiff at her last known address.

DATED this 29th day of November, 2007.

BY THE COURT:


s/Laurie Smith Camp
United States District Judge

26